# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **VADIS LAMBERT,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00055 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

The plaintiff, Vadis Lambert, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

-1-

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lambert protectively filed her applications for DIB and SSI on October 4, 2005, alleging disability as of February 13, 2005, (Record, ("R."), at 66-69, 369-72), due to a neck injury, right shoulder problems, nerves and a herniated disc in her back. (R. at 91, 106-07.) The claims were denied initially and upon reconsideration. (R. at 38-40, 373.) Lambert then requested a hearing before an administrative law judge, ("ALJ"). (R. at 58.) A hearing was held on November 21, 2006, at which Lambert testified and was represented by counsel. (R. at 405-43.)

By decision dated May 4, 2007, the ALJ denied Lambert's claims. (R. at 23-37.) The ALJ found that Lambert met the insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 31.) The ALJ also found that Lambert had not engaged in substantial gainful activity since February 13, 2005, the alleged onset date. (R. at 31.) The ALJ determined that the medical evidence established that Lambert suffered from severe impairments, namely degenerative disc disease, depression and headaches. (R. at 31.) However, he found that Lambert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.) After consideration of the evidence of record, the ALJ determined that Lambert

-2-

retained the residual functional capacity to perform light work,[1] specifically noting that Lambert could sit for six hours in a typical eight-hour workday, stand and/or walk up to six hours in a typical eight-hour workday, frequently lift and/or carry items weighing up to 10 pounds and occasionally lift and/or carry items weighing up to 20 pounds. (R. at 31.) In addition, the ALJ found that Lambert could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 32.) The ALJ noted that Lambert needed to wear reading glasses for close work, and he determined that she needed appropriate supervision to understand, remember and carry out detailed work instructions. (R. at 32.) He also indicated that she was able to perform simple, low stress, unskilled work. (R. at 32.) Furthermore, the ALJ found that Lambert had moderate limitations in her ability to interact with the public, supervisors and co-workers. (R. at 32.) As such, the ALJ determined that Lambert was unable to perform her past relevant work, and that the transferability of job skills was not material to his determination of disability because the Medical-Vocational Rules supported a finding that Lambert was "not disabled," whether or not she possessed transferable job skills. (R. at 35.) The ALJ found that there were jobs existing in significant numbers in the national economy that Lambert could perform, including jobs as a cashier, a food preparer and a laundry worker. (R. at 35-36.) Thus, the ALJ concluded that Lambert was not under a disability as defined in the Act and was not entitled to benefits. (R. at 36.)

After the ALJ issued his decision, Lambert pursued her administrative appeals and sought review of the ALJ's decision. (R. at 378.) However, the Appeals Council

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

denied her request for review. (R. at 11-13A, 400-404.) On October 3, 2008, the Appeals Council set aside its previous denial of a request for review to consider additional evidence. (R. at 6-10.) Nonetheless, after considering the additional information, the Appeals Council found no reason to review the ALJ's decision, thus, the request for review was again denied. (R. at 6-10.) Lambert then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). This case is now before the court on Lambert's motion for summary judgment, which was filed April 3, 2009, and on the Commissioner's motion for summary judgment, which was filed May 1, 2009.

## *II. Facts*

Lambert was born in 1962, (R. at 69, 115), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Lambert earned a general equivalency development diploma, ("GED"), and completed additional vocational training as a certified nurse's assistant. (R. at 123, 411.) Lambert has past relevant work experience as a lab technician and as a sewing machine operator. (R. at 119.)

At the hearing before the ALJ on November 21, 2006, Lambert testified that she worked as a certified nurse's assistant for about one year. (R. at 411.) However, based upon the testimony, it was unclear if this particular work occurred during the relevant time period, i.e. the last 15 years. (R. at 411-12.) Lambert testified that she worked as a sewing machine operator for approximately seven years. (R. at 413.)

-4-

She also indicated that she worked for approximately seven years as a lab technician in a dentist's office. (R. at 413.) While employed as a lab technician, Lambert performed various jobs, noting that she was required to lift five-gallon containers and an object weighing 25 to 50 pounds every two days. (R. at 414-15.) She also indicated that the employment required significant work using the hands and fingers. (R. at 415, 417.) Lambert stated that her various responsibilities as a lab technician required different activities, explaining that one required significant standing and bending, while another required mostly sitting. (R. at 415-16.)

Lambert further testified that she ceased work as a lab technician due to sleep difficulties, as well as neck, back and shoulder pain. (R. at 417-18.) She attributed the back pain to an injury that occurred 20 years ago, stating that she had experienced pain ever since the injury. (R. at 418.) She testified that, in the two or three years prior to the hearing, she had experienced a lot of leg, back and shoulder pain. (R. at 418.) Lambert stated that her problems impacted her work for more than one year before she stopped working. (R. at 418.) Lambert claimed that her condition caused her to consistently miss work during her last year of employment. (R. at 418-19.)

Although Lambert acknowledged receiving treatment for her pain, she indicated that the medication did not help. (R. at 419.) She also stated that, due to a lack of medical insurance, she sought treatment at several different places, noting that she saw whoever would treat her. (R. at 420.) She testified that her worst pain was in her neck and back, stating that her neck pain caused headaches. (R. at 420.) Lambert testified that she treated her conditions with pain medication and muscle relaxers. (R. at 421.)

Lambert stated that, on a good day, she could intermittently wash dishes, explaining that she had to take several breaks to complete the task. (R. at 422.) She noted that standing for extended periods resulted in back pain, particularly in the lower back area, near her right hip. (R. at 422.) Lambert also testified that she could not sit for extended periods due to the pain. (R. at 423.) She said that, on a good day, she could sit for approximately 30 minutes at a time. (R. at 423.) Conversely, on a bad day, she commented that she must lie down on her side, having to continually change positions. (R. at 423.) She testified that she could possibly sit upright for about 20 minutes on a bad day. (R. at 423.) Lambert further testified that she had difficulty walking. (R. at 424.) She stated that she could probably stand in one position for 20 to 30 minutes if she could lean against something. (R. at 424.) However, if she did not have something to lean against or to hold onto, she said she could not stand for any duration. (R. at 424.) Lambert indicated that it "kill[ed her] just to get up and manage to get to the bathroom." (R. at 424.) Lambert testified that, on a good day, she could lift less than a gallon of milk. (R. at 425.) She stated that she has to lie down during the day three or four days a week due to headaches, as well as neck and back pain. (R. at 425.) She acknowledged that she was able to prepare sandwiches for herself, and stated that she could prepare food for her child if it was something that did not take a long time to prepare. (R. at 426.)

Lambert indicated that her headaches often caused feelings of nausea. (R. at 426-27.) She stated that her "bad" headaches sometimes lasted up to six days, estimating that she experienced headaches 12 times per month. (R. at 427.) She explained that her headaches had worsened in the nine months prior to the hearing. (R. at 427.) Lambert estimated that she slept about three hours per night, noting that

-6-

her inability to sleep was related to her pain.  (R. at 427.)  Lambert testified that she also was prescribed medication for depression because of crying spells, loss of enjoyment and a lack of desire to do things.  (R. at 429.)  Lambert explained that she could not work a full-time job.  (R. at 430.)

John Neuman, a vocational expert, also testified at Lambert's hearing.  (R. at 433-41.)  Neuman identified Lambert's past work as a nurse's assistant as heavy,[2] semiskilled work, noting that she had no skills from that occupation that would transfer.  (R. at 435.)  Lambert's past employment as a sewing machine operator was identified as medium,[3] semiskilled work, and it was noted that those skills were transferable to jobs as a sewing machine operator at the light exertional level.  (R. at 435.)  Neuman identified a portion of Lambert's past work as a dental technician as medium, semiskilled work, and the remaining portion as light, skilled work.  (R. at 436.)   He further noted that there were no transferable skills to the sedentary[4] exertional level.  (R. at 436.)

The ALJ asked Neuman to consider a hypothetical individual of Lambert's

---

[2]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If an individual can perform heavy work, she also can perform medium, light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If an individual can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

[4]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008).

Case 2:08-cv-00055-GMW-PMS   Document 18   Filed 06/08/09   Page 7 of 28   Pageid#: 64

same age, education and past work experience who could occasionally lift and/or carrying items weighing up to 20 pounds, including upper pulling, frequently lift and/or carry items weighing up to 10 pounds, including upper pulling, stand and/or walk with normal breaks for six hours in a typical eight-hour workday and sit with normal breaks for a total of six hours in a typical workday. (R. at 436.) The ALJ also stated that the hypothetical individual could only occasionally climb, balance, stoop, kneel, crouch and crawl, and the individual would be further limited by farsightedness. (R. at 436-37.) Neuman testified that such an individual would be limited to a broad range of light work, noting that it would eliminate all of Lambert's past employment except her work as a dental lab technician. (R. at 437.) Neuman stated that such an individual could perform jobs in the light, unskilled category, such as a cashier, a food preparation worker and a laundry worker. (R. at 438.)

The ALJ next asked Neuman to consider a hypothetical individual that was moderately limited in her ability to understand, remember and carry out detailed and instructions; maintain attention and concentration for extended periods; perform activities around a schedule and maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple, work-related decisions, complete a normal workday and workweek without psychologically based symptoms; perform at a persistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instruction and respond appropriately to supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting; and set realistic goals. (R. at 438-39.) The ALJ asked Neuman to consider these additional limitations and

-8-

whether they would alter his response to the previous hypothetical. (R. at 439.) Based upon the definition of moderate limitations, Neuman opined that the additional limitations would result in no changes to his previous opinion. (R. at 439.) Neuman agreed that an individual with the above-mentioned limitations would be capable of performing simple, non-stressful, competitive, unskilled jobs. (R. at 439-40.) Neuman further agreed that such a hypothetical individual would be able to perform simple, competitive work under appropriate supervision. (R. at 440.)

The ALJ then asked Neuman to consider a hypothetical individual with the same physical limitations as noted above, but who would be likely to experience an exacerbation of symptoms when placed in a situation where she was expected to successfully navigate typical stressors encountered in gainful employment, including the need to interact appropriately with co-workers and the public and who, during episodes of stress, would not likely be able to perform work activities on a consistent basis without special or additional supervision. (R. at 441.) Neuman testified that such an individual would be unable to work because she would need "accommodation and special circumstances." (R. at 441.)

In rendering his decision, the ALJ reviewed medical records from Dales Chiropractic; Bluefield Regional Medical Center; Allergy Immunology Associates of Southwest Virginia; Bland County Medical Clinic; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Gary Craft, M.D.; Melinda Wyatt, M.S.; Howard S. Leizer, Ph.D, a state agency psychologist; Eugenie Hamilton, Ph.D, a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; and Bluestone Health Center. Lambert's counsel also submitted additional medical records from Dr.

Harold A. Cofer Jr., M.D., Bluefield Regional Medical Center and Bluestone Health Center to the Appeals Council.[5]

Lambert has not challenged any of the ALJ's findings with respect to her alleged physical impairments. Thus, the facts summarized will focus only on the medical records relevant to her alleged mental impairments. Furthermore, although the record contains medical records dating back to as early as 1995, for the purposes of this opinion, the undersigned will only summarize the medical evidence relevant to this decision, i.e. those medical records dated after the alleged onset date of February 13, 2005.

Lambert was treated at Bland County Medical Clinic for complaints of depression, stress, fatigue, anxiety, nervousness, crying episodes and insomnia. (R. at 193-247.) During the relevant time period, on February 18, 2005, Pat Mitchell, FNP, advised Lambert to quit her job due to depression, stress and anxiety. (R. at 197.) Mitchell noted that Lambert should take a leave of absence and indicated that she would be able to return to work once she began a treatment regimen of medication to address her problems. (R. at 197.) Mitchell specifically noted that Lambert would be unable to work from February 15, 2005, to March 8, 2005. (R. at 197.)

Dr. Gary Craft, M.D., performed an Internal Medicine Consultative Examination on January 24, 2006. (R. at 250-59.) In Dr. Craft's report, which was

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

dated January 30, 2006, he noted that Lambert alleged a history of anxiety depressive disorder, which did not require treatment. (R. at 252.) Dr. Craft further noted that Lambert was extremely well-oriented, that she related well and she exhibited an intact gross mental status. (R. at 252.)

On January 27, 2006, Lambert presented for a consultative psychiatric evaluation, which was performed by Melinda Wyatt, M.S. (R. at 255-61.) In addition to complaints of several physical ailments, Lambert reported feelings of depression and nervousness. (R. at 255.) Lambert also reported a suicide attempt as a teenager that led to a hospitalization at a state hospital. (R. at 256.) She explained that she began experiencing depression as an adult about three and a half years prior to this particular examination, which she attributed to her husband's incarceration. (R. at 256.) Lambert indicated that she experienced problems with concentration and tearfulness. (R. at 256.) In addition, Lambert reported problems such as low self-esteem, insomnia, irritability and a change in appetite. (R. at 256.) She denied all additional mental health concerns, including suicidal/homicidal ideations or psychotic processing. (R. at 256.) Lambert indicated that, other than her adolescent suicidal gesture, she had not received any outpatient psychiatric or psychological treatment. (R. at 257.)

Wyatt noted that Lambert's thought process appeared to be organized and logical, and her thought content was devoid of delusions, preoccupations, obessions or phobias. (R. at 258.) There was no evidence of perceptual abnormalities such as hallucinations or delusions. (R. at 258.) Wyatt observed Lambert's mood to be depressed, irritable and tearful. (R. at 258.) Lambert's affect appeared to be

-11-

restricted, but she was oriented in all spheres.  (R. at 259.)  Her judgment was observed to be poor and her immediate memory was found to be within normal limits.  (R. at 259.)  Wyatt found Lambert's recent memory to be markedly deficient and her remote recall was impaired.  (R. at 259.)  Her insight was found to be limited, her concentration was adequate, her persistence was within normal limits and her pace was moderately slow.  (R. at 259.)  During the evaluation, Lambert interacted in a moderately deficient fashion.  (R. at 259.)  Lambert was diagnosed with, among other things, a depressive disorder, not otherwise specified, occupational problems, problems with her primary support group and Wyatt assessed Lambert's Global Assessment of Functioning, ("GAF"), score at 60.[6]  (R. at 259.)  Wyatt opined that, with appropriate treatment for depression, Lambert's prognosis appeared to be fair.  (R. at 260.)  Wyatt determined that Lambert was capable of managing an allowance.  (R. at 260.)  Wyatt also noted that Lambert would likely experience an exacerbation of symptoms if placed in a situation in which she was expected to successfully navigate typical stressors encountered in gainful employment, including the need to interact appropriately with co-workers and the public.  (R. at 260.)  Lastly, Wyatt found that, during episodes of stress, Lambert would unlikely be able to perform work activities on a consistent basis without special or additional supervision.  (R. at 261.)


On February 14, 2006, Howard S. Leizer, Ph.D., a state agency psychologist,

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 51-60 indicates "[m]oderate symptoms . . .  OR moderate difficulty in social, occupational, or school functioning."  DSM-IV at 32.

completed a Psychiatric Review Technique form, ("PRTF"). (R. at 265-78.) Leizer determined that a residual functional capacity assessment was needed and found that Lambert suffered from symptoms of an affective disorder. (R. at 265.) Although Leizer found that Lambert suffered from depression, not otherwise specified, he indicated that the findings did not precisely satisfy the diagnostic criteria of an affective disorder. (R. at 268.) Leizer found Lambert to be moderately limited in her activities of daily living and in maintaining social functioning. (R. at 275.) No episodes of decompensation were noted. (R. at 275.) Leizer explained that Lambert's alleged limitations appeared to be related to her physical complaints. (R. at 278.) Leizer further explained that Lambert appeared to be depressed, but noted that the depression did not seem to significantly limit her ability to function. (R. at 278.) Thus, based on the medical evidence, Leizer found that Lambert had moderate depression-related limitations, and he concluded that she was capable of performing simple, non-stressful, competitive, unskilled work. (R. at 278.)

Leizer also completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on February 14, 2006. (R. at 279-82.) Leizer found no significant limitations in her ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to work in coordination with or proximity to others without being distracted by them; and to ask simple questions or request assistance. (R. at 279-80.) Lambert was found to be moderately limited in the following areas: the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an

ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others. (R. at 279-80.)

On April 5, 2006, Eugenie Hamilton, Ph.D., another state agency psychologist, completed a MRFC, noting findings nearly identical to those of Leizer. (R. at 284-86.) In fact, there was only one difference in their findings. Instead of finding that Lambert was moderately limited in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness as Leizer did, Hamilton found that Lambert was not significantly limited in this particular area. (R. at 285.) Hamilton also determined that the medical evidence established medically determinable impairments of depression and anxiety, but explained that, despite these conditions, Lambert could nonetheless perform simple, competitive work with appropriate supervision. (R. at 286.) Lastly, Hamilton noted that Lambert's allegations were only partially credible. (R. at 286.) Hamilton also completed a PRTF on April 5, 2006, noting findings identical to those contained Leizer's February 2006 PRTF. (R. at 288-301.)

Lambert presented to Bluestone Health Center on July 19, 2006, complaining

of, among other things, feelings of depression. (R. at 357-60.) Lambert explained that she cried easily and also reported a decreased energy level, sleep difficulties and stress. (R. at 357-58.) She indicated that she had been previously prescribed Zoloft to treat her depression; however, she stated that she discontinued the medication because it did not help her. (R. at 358.) The clinical assessment noted depression, and Lambert was prescribed Celexa and Elavil to address her problems. (R. at 358.) Lambert returned to Bluestone Health Center on September 27, 2006. (R. at 398.) She explained that she discontinued her prescriptions of Celexa and Elavil, noting that the medications caused side effects such as forgetfulness. (R. at 398.) Lambert expressed concern that she might be bipolar and was referred to Cumberland Mountain Community Services for further evaluation of her mental condition. (R. at 398.)

On October 26, 2006, a treating source from Bluestone Health Center advised that Lambert was unable to work due to depression and neck pain, noting that the limitations would likely last six to 12 months. (R. at 366.) Lambert again presented to Bluestone Health Center on November 8, 2006, and reported that after her visit to Cumberland Mountain Community Services, she determined that they could not help her. (R. at 397.) She also reported that she continued to suffer from depression and sleep difficulties. (R. at 397.) She was prescribed Ambien to treat her insomnia, and Cymbalta was ordered to treat her symptoms of depression. (R. at 397.) Lambert returned for a follow-up appointment on January 31, 2007, and was prescribed Cymbalta for depression. (R. at 396.)

Lambert was treated by Dr. Harold A. Cofer Jr., M.D., from December 4, 2007,

-15-

to February 5, 2008. (R. at 14-20.) On December 4, 2007, Lambert complained of depression and nervousness, which she attributed to financial and marital problems. (R. at 18.) She also reported improvements in her sleep pattern and decreased feelings of tearfulness, guilt and isolation. (R. at 18.) She was prescribed Lexapro to treat her symptoms. (R. at 18.) On December 20, 2007, she presented for a follow-up appointment and indicated that she was unable to tolerate Lexapro, claiming that it caused additional nervousness. (R. at 18.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

-16-

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 4, 2007, the ALJ denied Lambert's claims. (R. at 23-37.) The ALJ found that Lambert met the insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 31.) The ALJ also found that Lambert had not engaged in substantial gainful activity since February 13, 2005, the alleged onset date. (R. at 31.) The ALJ determined that the medical evidence established that Lambert suffered from severe impairments, namely degenerative disc disease, depression and headaches. (R. at 31.) However, he found that Lambert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.) After consideration of the evidence of record, the ALJ determined that Lambert retained the residual functional capacity to perform light work, specifically noting that Lambert could sit for six hours in a typical eight-hour workday, stand and/or walk up to six hours in a typical eight-hour workday, frequently lift and/or carry items weighing up to 10 pounds and occasionally lift and/or carry items weighing up to 20 pounds. (R. at 31.) In addition, the ALJ found that Lambert could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 32.) The ALJ noted that Lambert needed to wear reading glasses for close work, and he determined that she needed appropriate supervision to understand, remember and carry out detailed work instructions. (R. at 32.) He also indicated that she was able to perform simple, low

stress, unskilled work. (R. at 32.) Furthermore, the ALJ found that Lambert had moderate limitations in her ability to interact with the public, supervisors and co-workers. (R. at 32.) As such, the ALJ determined that Lambert was unable to perform her past relevant work and that transferability of job skills was not material to his determination of disability because the Medical-Vocational Rules supported a finding that Lambert was "not disabled," whether or not she possessed transferable job skills. (R. at 35.) The ALJ found that there were jobs existing in significant numbers in the national economy that Lambert could perform, including jobs as a cashier, a food preparer and a laundry worker. (R. at 35-36.) Thus, the ALJ concluded that Lambert was not under a disability as defined in the Act and was not entitled to benefits. (R. at 36.)

Lambert argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-16.) Specifically, Lambert contends that the ALJ erred in evaluating her mental impairments, claiming that the evidence of record indicates that she is more mentally limited than found by the ALJ. (Plaintiff's Brief at 9-12.) Lambert also argues that, although the ALJ stated that he gave great weight to the state agency psychologists, he failed to adequately discuss the mental limitations contained in their findings and failed to include such findings in his residual functional capacity determination. (Plaintiff's Brief at 12-14.) Lastly, Lambert argues that the ALJ erred by rejecting every medical opinion of record pertaining to mental limitations, and, thus, improperly substituted his opinion for that of a trained medical professional. (Plaintiff's Brief at 15-16.)

-18-

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Lambert's argument that the medical evidence demonstrates that she is more mentally limited than found by the ALJ. While Lambert references evidence from several medical sources, her argument largely hinges upon the assertion that the ALJ failed to accord proper weight to the opinion of Melinda Wyatt, M.S. (Plaintiff's Brief at 9-11.) In the ALJ's written opinion, he explained

that, after consideration of Wyatt's opinion that Lambert "would have problems interacting with co-workers and the public and that during moderate period[s] of stress she would need special or additional supervision to perform work activities on a consistent basis . . . [and] in conjunction with [Lambert's] reported impaired social function and occasional irritability and self esteem issues," the ALJ concluded that Lambert needed appropriate supervision to understand, remember and carry out detailed instructions, that she was limited to simple, low stress, unskilled work and that she had moderate limitations in her ability to interact with the public, supervisors and co-workers. (R. at 34.) While giving some credence to this portion of Wyatt's opinion, the ALJ made it perfectly clear that he gave no weight to any opinion by Wyatt that Lambert was unable to work, noting that such an opinion would be inconsistent with the GAF score of 60 assessed by Wyatt, as well as Lambert's mental health treatment history, her activities of daily living and the opinions of the state agency psychologists. (R. at 34.) Thus, Lambert now argues that the ALJ failed to accord proper weight to Wyatt's entire opinion. After a review of the record, I disagree.

The court recognizes that there is an inconsistency within Wyatt's opinion. On one hand she assessed Lambert's GAF score at 60, which indicated only moderate limitations, and then, conversely, she found that Lambert's symptoms would be exacerbated with interaction with co-workers and the public and that Lambert would likely be unable to perform work activities on a consistent basis without special or additional supervision. (R. at 261.) Lambert contends that if the ALJ wanted to call into question Wyatt's opinion due to this inconsistency, he should have "recontacted" her for further clarification. (Plaintiff's Brief at 12.)

-20-

According to the regulations, a consultative examination will be reviewed "to determine whether the specific information requested has been furnished." 20 C.F.R. §§ 404.1519p(a), 416.919p(a) (2008). Among the factors considered by the ALJ is "[w]hether the report is internally consistent[,]" and if the report is found to be inadequate or incomplete, the ALJ "will contact the medical source who performed the consultative examination, give an explanation of [the] evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." 20 C.F.R. §§ 404.1519p(a)(2), (b), 416.919p(a)(2), (b) (2008). The regulations also state that, when evaluating opinion evidence, "[i]f any of the evidence in [the] record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the ALJ] will weigh all of the evidence and see whether [he] can decide whether [the claimant is] disabled based on the evidence [of record]." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2008). In addition, the court notes that, ultimately, it is the duty of the ALJ, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *See generally King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979).

In this case, the ALJ acknowledged the inconsistency in Wyatt's opinion. However, because the remaining evidence of record weighed in favor of only moderate limitations, there was no need for the ALJ to contact Wyatt for clarification of this discrepancy. Instead, as outlined in the relevant regulation, when evidence is internally inconsistent, the ALJ should weigh all of the evidence and determine if a disability finding can be made based upon the evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2008). Here, state agency psychologists Leizer and Hamilton noted no more than moderate mental limitations, and each concluded that

-21-

Lambert was capable of performing simple, nonstressful, competitive, unskilled work. (R. at 265-82, 284-86, 288-301.) Thus, the state agency psychologists offered opinions that were consistent with the ALJ's residual functional capacity determination. Moreover, the ALJ pointed out that Lambert's lack of a history of mental health treatment and evidence of her activities of daily living supported his conclusion. (R. at 34.) Notably, the record shows that Lambert repeatedly chose to discontinue medications such as Zoloft, Elavil and Lexapro, which were all prescribed to treat her alleged mental impairments. (R. at 18, 358, 398.) Similarly, despite being referred to Cumberland Mountain Community Services for further evaluation of her mental condition, (R. at 398), after her initial visit, Lambert decided to discontinue the treatment. (R. at 397.)

The court recognizes that the record contains opinion evidence from Bland County Medical Clinic in which Pat Mitchell, FNP, advised Lambert to quit her job due to depression, stress and anxiety. (R. at 197.) However, despite this apparent restrictive opinion, the undersigned notes that Mitchell also opined that Lambert would likely be able to return to work once she began an appropriate treatment regimen. (R. at 197.) Furthermore, this particular opinion only stated that Lambert would be unable to work through March 5, 2005. (R. at 197.) Therefore, for the reasons stated above, I am of the opinion that the ALJ properly evaluated Lambert's mental impairments and that his residual functional capacity finding is supported by substantial evidence of record.

Next, Lambert argues that, despite according significant weight to the state agency psychologists, the ALJ failed to adequately discuss the mental limitations

Case 2:08-cv-00055-GMW-PMS   Document 18   Filed 06/08/09   Page 22 of 28   Pageid#: 79

contained in their findings and failed to include such findings in his residual functional capacity determination. (Plaintiff's Brief at 12-14.) This argument is without merit.

On February 14, 2006, state agency psychologist Leizer completed a PRTF and determined that Lambert suffered from symptoms of an affective disorder. (R. at 265.) Although Leizer found that Lambert suffered from depression, not otherwise specified, he indicated that the findings did not precisely satisfy the diagnostic criteria of an affective disorder. (R. at 268.) Leizer found Lambert to be moderately limited in her activities of daily living and in maintaining social functioning. (R. at 275.) No episodes of decompensation were noted. (R. at 275.) Leizer explained that Lambert's alleged limitations appeared to be related to her physical complaints. (R. at 278.) Leizer further explained that Lambert appeared to be depressed, but noted that the depression did not seem to significantly limit her ability to function. (R. at 278.) Thus, based on the medical evidence, Leizer found that Lambert had moderate depression-related limitations, and he concluded that she was capable of performing simple, non-stressful, competitive, unskilled work. (R. at 278.)

Leizer also completed an MRFC on February 14, 2006. (R. at 279-82.) Leizer found no significant limitations in Lambert's ability to remember locations and work-like procedures; to understand, remember and carry out very short and simple instructions; to work in coordination with or proximity to others without being distracted by them; and to ask simple questions or request assistance. (R. at 279-80.) Lambert was found to be moderately limited in the following areas: the ability to understand, remember and carry out detailed instructions; the ability to maintain

attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others. (R. at 279-80.)

On April 5, 2006, state agency psychologist Hamilton completed a MRFC, noting findings nearly identical to those of Leizer. (R. at 284-86.) The sole difference in the two opinions was that, instead of finding that Lambert was moderately limited in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness as Leizer found, Hamilton found that Lambert was not significantly limited in this particular area. (R. at 285.) Hamilton also determined that the medical evidence established medically determinable impairments of depression and anxiety, but explained that, despite these conditions, Lambert could nonetheless perform simple, competitive work with appropriate supervision. (R. at 286.) Lastly, Hamilton noted that Lambert's allegations were only partially credible. (R. at 286.) Hamilton also completed a PRTF on April 5, 2006, noting findings identical to those contained Leizer's February 2006 PRTF. (R. at 288-301.)

Lambert claims that, because the ALJ gave significant weight to the state agency psychologists' opinions, his failure to specifically mention each of the moderate limitations contained in their findings indicates that he did not properly discuss and analyze the relevant evidence of record. (Plaintiff's Brief at 12-14.) As stated earlier, in determining whether substantial evidence supports the Commissioner's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In fact, the Commissioner "must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). The United States Court of Appeals for the Fourth Circuit has stated that,

> The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In the case hand, it is obvious that the ALJ considered the opinions of the state agency psychologists, as he plainly stated that he accorded significant weight to those opinions. (R. at 35.) The ALJ noted that the state agency psychologists determined that Lambert retained the ability to perform unskilled, nonstressful, light work on a sustained basis, opining that such a finding was "generally consistent" with the record

-25-

as a whole. (R. at 35.) It is clear from the record that the ALJ did not specifically reference each moderate mental limitation noted by the state agency psychologists in his residual functional capacity finding, and he did not go into great detail in discussing either his acceptance or rejection of those limitations. However, the court notes that a discussion of his rejection of the limitations was not necessary because a review of the record demonstrates that the limitations were actually accepted by the ALJ and encompassed within his residual functional capacity finding. In fact, at the hearing, a vocational expert considered each of the moderate limitations contained in the state agency psychologists' findings and determined that an individual who suffered from such limitations would be able to perform light jobs, such as a cashier, a food preparation worker and a laundry worker. (R. at 438-440.) The vocational expert further explained that such an individual would be capable of performing simple, non-stressful, competitive, unskilled jobs. (R. at 439-40.) Thus, based upon the ALJ's rationale within his written opinion, as well as the testimony provided by the vocational expert at the hearing, I am of the opinion that the ALJ properly considered and analyzed the opinions of Leizer and Hamilton. As such, the court finds that the ALJ's residual functional capacity determination properly encompassed, and accounted for, the limitations set forth by the state agency psychologists, and, thus, was supported by substantial evidence of record.

Lastly, Lambert argues that the ALJ erroneously rejected every medical opinion of record pertaining to the alleged mental impairments, and thereby improperly substituted his opinion for that of a trained medical professional. (Plaintiff's Brief at 15-16.) Again, I disagree.

"In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of [a] plaintiff's psychiatric problems for that of a trained medical professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). As explained above, the ALJ did not reject the opinions of Wyatt or the opinions of the state agency psychologists. Instead, he justifiably accepted and rejected portions of Wyatt's findings, and he accorded significant weight and essentially adopted Leizer's and Hamilton's opinions regarding Lambert's mental impairments. The record shows that there was both psychiatric and psychological evidence of record to support the ALJ's decision. Thus, the court finds that the ALJ did not substitute his opinion for that of a trained mental health professional; instead, the ALJ's findings were soundly supported by substantial evidence of record, which included opinion evidence from multiple mental health professionals.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Lambert's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 8th day of June 2009.

-27-

_/s/_ _Glen M. Williams_

SENIOR UNITED STATES DISTRICT JUDGE

Case 2:08-cv-00055-GMW-PMS   Document 18   Filed 06/08/09   Page 28 of 28   Pageid#: 85